2014 UT App 18

**STATE of Utah, Plaintiff and Appellee,**

v.

**Mitchell Edward WOLF, Defendant and Appellant.**

**No. 20110726–CA.**

Court of Appeals of Utah.

Jan. 24, 2014.

Thomas M. Burton, for Appellant.

Sean D. Reyes and Karen A. Klucznik, for Appellee.

Judge J. FREDERIC VOROS JR. authored this Opinion, in which Judge CAROLYN B. McHUGH and Senior Judge JUDITH M. BILLINGS concurred.[1]

VOROS, Judge:

¶ 1 Mitchell Edward Wolf stood trial for charges that he stalked and threatened his long-time partner and one of her co-workers. Late at night after the first day of trial, Wolf shot himself in the stomach. When he did not appear in court the next morning, the trial court completed the trial in Wolf's absence. The jury convicted Wolf on all charges. Wolf appeals. We hold that because Wolf's trial counsel raised a bona fide doubt as to Wolf's competency to stand trial, the trial court was required to order a full hearing into Wolf's competency. We vacate Wolf's convictions and remand for further proceedings.

## BACKGROUND [2]

### *Wolf's Threats*

¶ 2 Wolf and B.W. met in 1980 and began an "off and on" relationship. They moved in

---

1. The Honorable Judith M. Billings, Senior Judge, sat by special assignment as authorized by law. *See generally* Utah Code Jud. Admin. R. 11–201(6).

2. In reviewing the trial court's refusal to order a

together and in 1990 had a child. Since 2000, B.W. has been employed at a kitchen equipment supply company.

¶ 3 Wolf and B.W.'s relationship ended in early 2007. According to B.W.'s trial testimony, in a series of phone calls over the following two years, Wolf made threats against B.W., their daughter K.W., and several of B.W.'s co-workers. In April 2008 Wolf called B.W. at work and demanded that she sell her house and quit her job or "all [her] dirty little secrets . . . were going to be revealed by 10:00 the next morning." In September 2008, one of Wolf's friends warned B.W. that if she refused to return Wolf's calls, Wolf would "go out in the desert and . . . kill himself" and implicate B.W. in his death. When B.W. called Wolf and insisted that their relationship was over, Wolf ended the call by saying, "I could be [at your workplace] right now." B.W. and her co-workers then began receiving numerous "prank calls" from someone they believed was Wolf. For a period of about six months, B.W. and her co-workers received approximately twenty phone calls each day in which the caller would either hang up or remain silent.

¶ 4 Wolf's calls to B.W. began to follow a pattern. Each time he called, he said, "[T]hree things, three things bitch." B.W. testified that the "three things" were quitting her job, selling her house, and giving Wolf his things back. B.W. usually hung up the phone. During one call, though, B.W. asked Wolf, "What are you going to do?" Wolf responded, "[Y]ou know what I'm going to do." Wolf made other statements that left B.W. with "serious concerns" for their daughter's safety.

¶ 5 One of B.W.'s co-workers (Co-worker) testified that he received a voicemail from Wolf that accused him of having an "improper relationship" with B.W. and made a threatening statement in reference to Co-worker's son. In the following months, Co-worker received numerous silent phone calls he believed were from Wolf. Finally Co-worker obtained a stalking injunction against

Wolf. Wolf was not served with the injunction, however, and the calls continued.

¶ 6 In one telephone conversation, Co-worker testified, Wolf threatened Co-worker's family and other employees. According to Co-worker, Wolf said he had "purchased weapons," that he knew how to make an explosive, and that he had rented a room at a hotel near Co-worker's workplace. Co-worker also stated that Wolf had said "he'd scoped out the homes" of other employees, had threatened that "innocents [would] be hurt," and had stated that "when the pain [got] to be too much, he [would] carry out his plan."

### Wolf's Trial

¶ 7 Wolf was charged with two counts of making terroristic threats and two counts of stalking. Wolf attended the first day of trial but did not take the stand; he planned to testify the next day. Between midnight and 1:00 a.m. that night, Wolf called 911, identified himself, "stated that he was going to shoot himself in the stomach, [and] indicated he was being accused of doing things he had not done." Police officers found him in a parked car with a handgun and a box of ammunition. He had, in fact, shot himself in the stomach.

¶ 8 In court the next morning, Wolf's attorney attempted to explain the situation to the judge:

[W]e have been able to confirm that [police] were involved in a self-inflicted shooting last night at approximately one a.m. Mr. Wolf shot himself in the stomach. He was transported to [a local hospital]. He had ER surgery. . . . [W]e were told by his friend . . . that they stabilized him. . . . I was told that he is expected to be there approximately six days [and then] they will take him up to the VA Hospital and keep him on psychiatric observation. I've been told but not confirmed that they will keep him for 30 days there.

Wolf's attorney sought a continuance but assured the court that he would not be moving

full competency hearing and its sentencing decision, "we recite the facts in a light most favorable to the trial court's findings." *Interwest*

*Constr. v. Palmer*, 923 P.2d 1350, 1352 (Utah 1996).

for a mistrial. While acknowledging that defendants who are voluntarily absent can be tried in absentia, Wolf's attorney stated that he believed he "could bring in psychologists who would say that [Wolf shooting himself in the stomach] showed he had gone to a level that ... with his mental illness ... [his absence] isn't truly a voluntary absence."

¶ 9 The State opposed a continuance, insisting that "this is [Wolf's] pattern, this is what he does." On "at least two prior occasions," the prosecutor said, "right in anticipation of court and immediately previous to an upcoming court date, [Wolf] would do something in a similar manner, would get involuntarily admitted into a mental institution." The prosecutor characterized Wolf's self-inflicted injury as "just another one of those voluntary delay tactics."

¶ 10 Before the lunch recess, the trial court stated that it needed to confirm whether Wolf shot himself and that "if it was self-inflicted" it was the court's "determination that [it would] proceed with trial." Based on the upsetting nature of the previous day's proceedings, the court concluded, "[T]he most likely scenario is ... that he's voluntarily absented himself and we can go forward." Wolf's attorney asked the court to reconsider continuing trial to enable Wolf to receive a psychological evaluation. He also specifically raised the issue of competency:

> [S]omeone who ... attempts to commit suicide has indications that he's not competent to proceed.... [Competency is] an issue that can be raised at any time if it becomes apparent [that a defendant's competency is in question,] and at this time I believe ... that [Wolf's] competency is clearly in question and I would ask [that the court] continue this trial so that we can get him properly evaluated for competency.

The court denied the request for a continuance, stating, "[W]e are going to proceed today with the trial in absentia.... Mr. Wolf's threat to take his own life has been persistent throughout all of these proceedings.... This appears to be nothing more than a tactic for delay." The proceedings continued without Wolf, and the court did not explain to the jury why he was absent.

¶ 11 After the lunch recess, Wolf's attorney again raised the issue of competency:

> I went back and reviewed Mr. Wolf's mental health records as well as the docket of this case before I was counsel. There [had] been a petition for competency ... raised [by Wolf's first attorney]. He then retained [his second attorney] who withdrew the petition. Looking through his medical history, I prepared a [second] petition and order for competency....

Wolf's attorney filed a brief competency petition. It closely resembled a competency petition the court had granted two years earlier, but it also included information related to Wolf's self-inflicted gunshot wound, which it characterized as a suicide attempt. When Wolf's attorney submitted the petition, the trial court said, "Well, I'm not sure what to say except it's a little too late since we're in the middle of a trial but the Court will receive it."

¶ 12 The jury found Wolf guilty of electronic communication harassment, making a terroristic threat, and two counts of stalking (one a felony, the other a misdemeanor).[3] On appeal, Wolf claims the trial court erred in declining to hold a competency hearing, in proceeding with the second day of trial in Wolf's absence, and in sentencing Wolf based on his felony stalking offense instead of his harassment offense.[4]

## ISSUES AND STANDARDS OF REVIEW

¶ 13 Wolf first contends that the trial court erred when it declined to order a full competency hearing. A competency determination presents "a mixed question of fact and law." *State v. Woodland*, 945 P.2d 665, 667 (Utah 1997). "The proper interpre-

---

3. See Utah Code Ann. § 76–5–106.5 (LexisNexis 2008) (stalking); *id.* § 76–5–107.3 (terroristic threat); *id.* § 76–9–201 (electronic communication harassment).

4. At oral argument before this court, the State moved to strike Wolf's reply brief as irrelevant and scandalous. *See* Utah R.App. P. 24(k); *Peters v. Pine Meadow Ranch Home Ass'n*, 2007 UT 2, ¶¶ 7–9, 22–23, 151 P.3d 962. We grant the motion and strike Wolf's reply brief.

tation of the statutory standard for competency is a question of law." *State v. Robertson,* 932 P.2d 1219, 1223 (Utah 1997) (citing *State v. Lafferty,* 749 P.2d 1239, 1243 (Utah 1988)), *overruled on other grounds by State v. Weeks,* 2002 UT 98, 61 P.3d 1000. Challenges centered on factual findings regarding competency, however, are "subject to a clearly erroneous standard of review." *Woodland,* 945 P.2d at 667.

¶ 14 Wolf next contends that the trial court erred by allowing his trial to continue in his absence "without making a meaningful determination [of whether] Wolf had voluntarily absented himself." Our resolution of the competency claim moots this claim. *See Jensen v. IHC Hosps., Inc.,* 2003 UT 51, ¶ 131, 82 P.3d 1076.

■ ¶ 15 Finally, Wolf contends that the trial court erred in failing to amend his conviction under *State v. Shondel,* 22 Utah 2d 343, 453 P.2d 146 (Utah 1969). "Our review under the *Shondel* rule focuses on the trial court's legal conclusions, which we review under a correction-of-error standard, according no particular deference to the trial court's ruling." *State v. Kent,* 945 P.2d 145, 146 (Utah Ct.App.1997).

## ANALYSIS

### I. Competency

¶ 16 Wolf contends that the trial court erred when it declined to order a full competency hearing. Wolf argues that the "facts and circumstances presented to and known by the trial court regarding Wolf's mental health status, including a self-inflicted gunshot wound to the abdomen, raised a bona fide doubt as to Wolf's competency and demanded further inquiry." In addition to the self-inflicted gunshot wound, Wolf argues, the court had before it evidence of "Wolf's undisputed and extensive history of bipolar disorder, coupled with numerous psychiatric hospitalizations." On that evidence, Wolf concludes, a trial court considering a competency petition faces "a statutory duty to order a competency hearing," and the trial court's denial of his petition violated his right to a fair trial.

¶ 17 The State responds that "the only hearing a trial court is statutorily required to hold when a competency petition is opposed is a limited hearing solely to determine whether the petition raises a bona fide doubt as to the defendant's competency." The trial court held a limited hearing on the morning of the second day of trial, the State argues, and at that hearing "the totality of the circumstances ... failed to raise a bona fide doubt as to [Wolf's] competency on the second day of trial." Therefore, "the trial court did not err in denying [Wolf] a competency hearing."

■ ¶ 18 "[T]he failure to observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent to stand trial deprives him of his due process right to a fair trial." *Drope v. Missouri,* 420 U.S. 162, 172, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975) (citing *Pate v. Robinson,* 383 U.S. 375, 385, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966)); *accord State v. Arguelles,* 2003 UT 1, ¶¶ 47–48, 63 P.3d 731. To protect that due process right, Utah law mandates that "[n]o person who is incompetent to proceed shall be tried for a public offense." Utah Code Ann. § 77–15–1 (LexisNexis 2008).

■ ¶ 19 A defendant qualifies as incompetent to proceed if his mental disorder renders him either (1) unable "to have a rational and factual understanding of the proceedings against him or of the punishment specified for the offense charged" or (2) unable "to consult with his counsel and to participate in the proceedings against him with a reasonable degree of rational understanding." *Id.* § 77–15–2; *see Dusky v. United States,* 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960); *accord State v. Holland,* 921 P.2d 430, 433 (Utah 1996). However, " '[t]he fact that a person is mentally ill, displays bizarre, volatile, and irrational behavior, or has a history of mental illness, does not mean that he or she is incompetent to stand trial. A defendant may be fit for trial even though his mind is otherwise unsound.' " *Jacobs v. State,* 2001 UT 17, ¶ 16, 20 P.3d 382 (quoting 21 Am.Jur.2d *Criminal Law* § 97 (1998)).

¶ 20 A court "may raise the issue of the defendant's competency at any time." Utah Code Ann. § 77–15–4 (LexisNexis 2008); *see also State v. Bailey*, 712 P.2d 281, 285 (Utah 1985). Defense counsel may also raise the issue of the defendant's competency by filing a competency petition. A competency petition must state that the petition "is filed in good faith and on reasonable grounds to believe the defendant is incompetent to proceed" and contain "a recital of the facts, observations, and conversations with the defendant that have formed the basis for the petition." Utah Code Ann. § 77–15–3 (LexisNexis 2008). A competency petition may also be filed by "the party alleged incompetent to proceed, any person acting on his behalf, the prosecuting attorney, or any person having custody or supervision over the person." *Id.; see also Arguelles*, 2003 UT 1, ¶ 49, 63 P.3d 731 (same).

¶ 21 Under the statute in effect at the time of trial, a court receiving a competency petition is required to follow certain steps. First, the court must stay proceedings. Utah Code Ann. § 77–15–5(1) (LexisNexis 2008). Second, the court must "pass upon the sufficiency of the allegations of incompetency." *Id.* If a party opposes the petition, the court must "hold a limited hearing solely for the purpose of determining the sufficiency of the petition" before it grants or denies the petition. *Id.* Third, if the court finds that the petition raises "a bona fide doubt as to the defendant's competency to stand trial," the court must "enter an order for a [full] hearing on the mental condition of the person who is the subject of the petition." *Id.; see also Pate*, 383 U.S. at 385, 86 S.Ct. 836. *But cf. Bailey*, 712 P.2d at 285 (applying an earlier version of Utah's competency statute, which made a competency hearing "*mandatory* ... [upon] the filing of a petition" (emphasis added)).[5]

¶ 22 A bona fide doubt as to a defendant's competency "is a lesser standard than a preponderance of the evidence." *United States v. Grist*, 299 Fed.Appx. 770, 778 (10th Cir.2008); *see also McGregor v. Gibson*, 248 F.3d 946, 954 (10th Cir.2001) ("To prevail on a procedural competency claim petitioner need not establish facts sufficient to show he was actually incompetent or show he was incompetent by a preponderance of the evidence."). A defendant "establishes a bona fide doubt if he shows that a reasonable judge should have doubted" whether the defendant "had 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' " or "had 'a rational as well as factual understanding of the proceedings against him.' " *McGregor*, 248 F.3d at 954 (quoting *Dusky*, 362 U.S. at 402, 80 S.Ct. 788). " '[E]vidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant' to the bona fide doubt inquiry." *Walker v. Attorney General of Okla.*, 167 F.3d 1339, 1346 (10th Cir.1999) (quoting *Drope*, 420 U.S. at 180, 95 S.Ct. 896). "Other relevant factors include evidence of mental illness and any representations of defense counsel about the defendant's incompetence." *McGregor*, 248 F.3d at 954 (citation and internal quotation marks omitted).

¶ 23 The State contends that by pausing trial proceedings, discussing the voluntariness of Wolf's absence, and briefly discussing Wolf's mental status, the trial court satisfied the statutory requirements for a stay of proceedings and a limited hearing to determine the sufficiency of the competency petition. Without accepting that characterization, we assume without deciding that the requirements for a stay and for a limited hearing were met here. We thus turn to the question of whether Wolf raised a bona fide doubt

5. Our legislature amended the competency statute in 2012. *See* Competency to Stand Trial Amendments, ch. 109, sec. 1, § 77–15–5(1)(b)(i)–(v), 2012 Utah Laws 365, 365; Amendments Regarding Competency to Stand Trial, ch. 311, sec. 1, § 77–15–5(11), 2012 Utah Laws 1480, 1481. The 2012 amendments clarify the two-step competency inquiry, but the "bona fide doubt" standard in effect at the time of Wolf's trial survived the 2012 amendments. The statute now reads: "The district court in which the [competency] petition is filed ... shall order an examination of the defendant and a hearing on the defendant's mental condition if the court finds that the allegations [contained in the petition] raise a bona fide doubt as to the defendant's competency to stand trial." Utah Code Ann. § 77–15–5(1)(b) (LexisNexis 2012).

as to his competency and was therefore entitled to a full competency hearing.[6]

¶ 24 The United States Supreme Court's decision in *Drope v. Missouri* controls. 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975). Drope was charged with rape of his wife. *Id.* at 164, 95 S.Ct. 896. As the parties prepared for trial, Drope's attorney obtained a continuance to allow Drope to "be examined and receive psychiatric treatment." *Id.* Drope's attorney later represented that Drope was "not a person of sound mind" and needed further psychiatric examination before trial. *Id.* at 165, 95 S.Ct. 896. The trial court denied further examination and the case proceeded to trial. *Id.* At trial, Drope's wife testified about Drope's psychiatric health. Early in the case she had believed that Drope "was sick and needed psychiatric care." *Id.* at 166, 95 S.Ct. 896. But "she also stated that she was not convinced [Drope] was sick after talking to his psychiatrist," and she testified that Drope had tried to choke and kill her shortly before trial. *Id.*

¶ 25 When Drope did not appear the next morning, the trial court ordered trial to proceed without him. *Id.* Drope's attorney informed the court that Drope had shot himself that morning and moved for a mistrial. *Id.* The court denied the motion, stating that Drope had brought the situation on himself. *Id.* It also ruled that Drope had voluntarily absented himself from trial. *Id.* at 167, 95 S.Ct. 896. The Missouri Supreme Court affirmed. *Id.* at 168, 95 S.Ct. 896.

¶ 26 The United States Supreme Court's analysis focused on "whether, in light of what was then known" to the trial court, "the failure to make further inquiry into petitioner's competence to stand trial . . . denied him a fair trial." *Id.* at 174–75, 95 S.Ct. 896. The lower courts had uniformly held that Drope never "acted in a manner that would cause the trial court to doubt his competence." *Id.* at 178, 95 S.Ct. 896. In fact, at sentencing the court concluded that Drope's suicide attempt implied competence: "the 'fact that

Mr. Drope shot himself to avoid trial suggests very strongly an awareness of what was going on.'" *Id.* at 178–79, 95 S.Ct. 896.

¶ 27 The Supreme Court disagreed. It held that the trial court's failure to conduct a competency hearing denied Drope a fair trial:

> [T]he record reveals a failure to give proper weight to the information suggesting incompetence which came to light during trial.... [W]hen considered together with the information available prior to trial and the testimony of [Drope's] wife at trial, the information concerning [Drope's] suicide attempt created a sufficient doubt of his competence to stand trial to require further inquiry on the question.

*Id.* at 179–80, 95 S.Ct. 896. The Court made several observations relevant here. First, "[e]ven when a defendant is competent at the commencement of trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial." *Id.* at 181, 95 S.Ct. 896. Second, "[w]hatever the relationship between mental illness and incompetence to stand trial, in [Drope's] case the bearing of the former on the latter was sufficiently likely that, in light of the evidence of petitioner's behavior including his suicide attempt, and there being no opportunity without his presence to evaluate that bearing in fact, the correct course was to suspend the trial until such an evaluation could be made." *Id.* Third, the fact that a stay to determine competency might "abort[ ] the trial is a hard reality, but . . . such a result might have been avoided by prompt psychiatric examination before trial, when it was sought by petitioner." *Id.* at 181–82, 95 S.Ct. 896.

■ ¶ 28 We base our determination of whether Wolf's behavior raised a bona fide doubt as to his competency on the information before the trial court on the second day of trial. When Wolf failed to appear that morning, his attorney informed the court

<hr />

6. It is unclear from the record whether the trial court applied the correct statutory standard. The record does not reflect a finding that Wolf failed to raise a "bona fide doubt" as to his competency. *See* Utah Code Ann. § 77–15–5 (LexisNexis 2008). However, because Wolf does not assert that the trial court applied an incorrect standard, we do not consider whether the court erred in this regard.

that Wolf had shot himself in the stomach, that medical personnel were working to stabilize him, and that the hospital expected to treat Wolf for approximately six days before transferring him to another hospital for psychiatric observation. Wolf's attorney then told the court about a conversation he had with Wolf the day before:

> After speaking with him last night about the tape [of a conversation between Wolf and his daughter], he did not want it played—and I think this may have triggered it, I think hearing how horrible he was being to his daughter I think triggered him. [The deputy district attorney] indicated that she noticed that he was staring off into the wall silently.

Wolf's attorney also told the court that Wolf "does legitimately suffer from ... mental health issues." After questioning Wolf's attorney and the deputy district attorney for several minutes, the trial judge announced,

> [I]f [the gunshot] was self-inflicted it's my determination that we're going to proceed with trial.... [T]he most likely scenario ... based upon his disposition and the difficulty that took place yesterday in terms of having to hear things ... that may be difficult to hear ... [is] that he's voluntarily absented himself and we can go forward.

Just before lunch, Wolf's attorney again raised the issue of Wolf's absence: "If I may, Your Honor, ... case law [indicates a] suicide attempt is more akin to a general medical emergency[,] ... and as I was saying earlier, I believe we need to look into [Wolf's] competency." The trial court responded, "Well, this is a pattern that's been well established ... in terms of what Mr. Wolf does."

¶ 29 After lunch, Wolf's attorney again raised the question of competency and filed a hastily prepared petition. He stated that he had "reviewed Mr. Wolf's mental health records as well as the docket" and found Wolf's earlier competency petition, which Wolf had withdrawn before the court held a competency hearing. That petition, Wolf's attorney stated, contained a competency evaluation from a licensed social worker.

¶ 30 The new petition mirrored the earlier one. It stated that Wolf "has a long and extensive history of treatment for bipolar disorder and has a history of medication noncompliance." The petition also stated that Wolf "engaged in a serious 'hunger strike'" in July 2009, that he had "a long history of suicidal ideation and attempt," and that he had "been found incompetent to proceed in matters in Wyoming in May, 2009 prior to transfer to Utah." Given Wolf's history of mental illness and his suicide attempt, the petition asserted, Wolf's "current competency to proceed is in question." In the petition, Wolf's attorney also presented his own evaluation of Wolf's competency:

> [B]ased upon my information of [Wolf], I believe he lacks the ability to: comprehend and appreciate the charges ... against him; disclose to counsel pertinent facts, events, and states of mind; comprehend and appreciate the range and nature of possible penalties ... that may be imposed in the proceedings against him; engage in a reasoned choice of legal strategies and options; understand the adversary nature of the proceedings against him; manifest appropriate Courtroom behavior; and testify relevantly....

The court received the petition but stated that "it's a little too late since we're in the middle of a trial."

¶ 31 The information before the trial court raised a bona fide doubt as to Wolf's competency to stand trial. Like Drope, Wolf entered trial with a long history of mental illness. Like Drope, Wolf shot himself between the first and second days of trial. And like Drope, Wolf was absent when the trial court considered his competency for the final time, leaving the court with no opportunity to assess in person the relationship between Wolf's mental illness and his competency to stand trial. *See Drope v. Missouri*, 420 U.S. 162, 181, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975). The competency petition also cited Wolf's "long and extensive history of treatment for bipolar disorder" and his "long history of suicidal ideation and attempt." According to the petition, a Wyoming court found Wolf incompetent in a separate 2009 case. And Wolf's attorney, who "is in the best position to determine whether the defendant's competency is suspect," *see Watts v. Singletary*, 87

F.3d 1282, 1288 (11th Cir.1996), averred that Wolf was unable to "comprehend and appreciate the charges … against him," "engage in reasoned choice of legal strategies and options," or "disclose to counsel pertinent facts, events, and states of mind."

¶ 32 We hold that Wolf's history of mental illness, punctuated mid-trial with a possible suicide attempt and underscored by his attorney's assertions, raised a bona fide doubt as to Wolf's competency to stand trial and therefore "require[d] further inquiry." See Drope, 420 U.S. at 180, 95 S.Ct. 896; see also Utah Code Ann. § 77–15–5 (LexisNexis 2008). Accordingly, the requirements of the competency statute were not satisfied.[7]

¶ 33 Where a defendant is tried notwithstanding having established a bona fide doubt as to competency, the proper remedy is to vacate the conviction. See Maxwell v. Roe, 606 F.3d 561, 576–77 (9th Cir.2010) (reversing the district court's habeas corpus denial when "the state trial and appellate courts unreasonably determined [the defendant] was not entitled to a competency hearing"); United States v. Giron–Reyes, 234 F.3d 78, 83 (1st Cir.2000) (vacating a defendant's conviction because the court was "not confident that [the defendant's] substantive rights were unaffected" by the trial court's failure to determine his competency); United States v. Nevarez–Castro, 120 F.3d 190, 192 (9th Cir.1997) (vacating a defendant's conviction when "the district court erred in denying [his] request for a competency hearing"); United States v. Purnett, 910 F.2d 51, 56 (2d Cir.1990) (reversing a defendant's conviction when trial court "allowed [the defendant] to proceed without counsel at pretrial proceed-

ings when his competency was at issue"). We therefore vacate Wolf's convictions and remand for further proceedings consistent with this opinion.

¶ 34 We note that our supreme court—as well as the United States Supreme Court—has ruled that a defendant's competency cannot be retrospectively determined. In State v. Holland, our supreme court stated, "No matter how well-intentioned the effort, we fail to see how the trial court could, on the basis of the record before it, adequately determine whether [the defendant] was competent three years earlier." 921 P.2d 430, 435 (Utah 1996). Invoking the rationale of "Dusky and its progeny," the court held that when a defendant's past competency is at issue, "the trial court must hold a hearing to determine the defendant's present competency." Id. (citing Dusky v. United States, 362 U.S. 402, 403, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960)); accord Drope, 420 U.S. at 183, 95 S.Ct. 896 (holding that retrospective competency hearings present "inherent difficulties" even "under the most favorable circumstances"); Pate v. Robinson, 383 U.S. 375, 387, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966) (reasoning that retrospective competency hearings do not allow the jury "to observe the subject of their inquiry" and force expert witnesses "to testify solely from information contained in the printed record"); Dusky, 362 U.S. at 403, 80 S.Ct. 788 (acknowledging the "difficulties of retrospectively determining" a defendant's competency). The bar on retrospective competency hearings articulated in Dusky and Holland applies here. The State may retry Wolf, but only if "at the time of such trial he is competent to be tried."

7. The State argues that even if the trial court erred in failing to order a full competency hearing, that failure constitutes harmless error. The cases the State cites to support that proposition, however, differ substantially from the present case. One case, Taylor v. State, involved a claim of ineffective assistance of counsel. 2007 UT 12, ¶¶ 90–96, 156 P.3d 739. One who asserts such a claim bears the burden of proving prejudice, that is, that "counsel's errors were so serious as to deprive the defendant of a fair trial." See Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Wolf is not asserting ineffective assistance of counsel here. The other cases cited by the State, State v. Lafferty and State v. Robertson, involved procedural mis-

steps that did not affect the defendants' substantial rights. State v. Lafferty, 2001 UT 19, ¶ 35, 20 P.3d 342 (holding that the trial court erred by conducting a competency hearing too soon after receiving psychiatrists' reports); State v. Robertson, 932 P.2d 1219, 1226–27 (Utah 1997) (holding that the trial court erred by not granting a formal stay while competency proceedings were pending), overruling recognized by State v. Maestas, 2012 UT 46, 299 P.3d 892. Where a defendant was denied a competency hearing altogether, controlling cases have not required a showing of prejudice. See, e.g., Drope v. Missouri, 420 U.S. 162, 178–82, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975); Pate v. Robinson, 383 U.S. 375, 384–86, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966).

*See Drope,* 420 U.S. at 183, 95 S.Ct. 896 (emphasis added).

## II. *Shondel*

■ ¶ 35 We base our decision to vacate Wolf's conviction on the trial court's failure to hold a competency hearing. But because the parties fully briefed and argued the application of *State v. Shondel,* 22 Utah 2d 343, 453 P.2d 146 (1969), and because the *Shondel* issue is "necessary to the final determination of the case" if Wolf is retried, *see* Utah R.App. P. 30(a), we exercise our discretion to address that issue on appeal "for purposes of providing guidance on remand." *See State v. Low,* 2008 UT 58, ¶ 61, 192 P.3d 867; *accord State v. James,* 819 P.2d 781, 795 (Utah 1991).

¶ 36 Wolf contends that under *Shondel* he "should have been sentenced for a class B misdemeanor under [Utah's] electronic communication harassment statute, rather than a third-degree felony under [its] domestic violence stalking statute," because the two statutes are "nearly identical" and "the evidence from trial supports a conviction under either statute." The State responds that "[t]he crimes of domestic violence stalking and electronic communications harassment do not criminalize exactly the same conduct" and that therefore the trial court properly sentenced Wolf under Utah's domestic violence stalking statute. The State is correct.

■ ¶ 37 "Equal protection of the law guarantees like treatment of all those [defendants] who are similarly situated." *State v. Bryan,* 709 P.2d 257, 263 (Utah 1985). Therefore, "where there is doubt or uncertainty as to which of two punishments is applicable to an offense an accused is entitled to the benefit of the lesser." *Shondel,* 453 P.2d at 148; *see also State v. Williams,* 2007 UT 98, ¶ 8, 175 P.3d 1029. But the *Shondel* doctrine applies only when the "two statutes are wholly duplicative as to the elements of the crime." *Bryan,* 709 P.2d at 263. When analyzing statutes under *Shondel,* the critical question is "whether the two statutes at issue proscribe exactly the same conduct, i.e., do they contain the same elements?" *State v. Gomez,* 722 P.2d 747, 749 (Utah 1986); *see*

*also State v. Kent,* 945 P.2d 145, 147 (Utah Ct.App.1997).

¶ 38 Utah's electronic communication harassment statute applies when a defendant "makes repeated contact" with the victim "by means of electronic communications" "with intent to annoy, alarm, intimidate, offend, abuse, threaten, harass, frighten, or disrupt the electronic communications of another." Utah Code Ann. § 76–9–201 (LexisNexis 2008). Utah's domestic violence stalking statute applies when a defendant

(2) . . . intentionally or knowingly engages in a course of conduct directed at a specific person and knows or should know that the course of conduct would cause a reasonable person:

(a) to fear for the person's own safety or the safety of a third person; or

(b) to suffer other emotional distress.

*Id.* § 76–5–106.5(2). Domestic violence stalking constitutes a third-degree felony if the offender "has been or is at the time of the offense a cohabitant" of the victim. *Id.* § 76–5–106.5(7), (7)(e).

¶ 39 Third-degree felony domestic violence stalking requires cohabitation between the defendant and the victim. Electronic communication harassment does not. Without delving more deeply into the statutory elements, we note that the domestic violence stalking statute's cohabitation requirement means that the two statutes are not "wholly duplicative," *Bryan,* 709 P.2d at 263, nor do they "contain the same elements," *Gomez,* 722 P.2d at 749. Accordingly, Wolf's sentence did not run afoul of *Shondel.*

## CONCLUSION

¶ 40 Wolf's history of mental illness and his possible suicide attempt raise a bona fide doubt as to his competency to stand trial. The trial court thus erred when it refused to order a full competency hearing. We therefore reverse Wolf's convictions and remand for further proceedings consistent with this opinion. Under *Shondel,* the domestic violence stalking statute and the electronic communications harassment statute are not whol-

ly duplicative, and therefore the trial court did not err in sentencing Wolf.