**2024 UT App 65**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
DARCY F. ANDERSON,
Appellant.

Opinion
No. 20220407-CA
Filed May 2, 2024

Fifth District Court, Cedar City Department
The Honorable Ann Marie McIff Allen
No. 201500370

Nicolas C. Wilde and Trevor J. Lee,
Attorneys for Appellant

Sean D. Reyes and Jonathan S. Bauer,
Attorneys for Appellee

JUDGE AMY J. OLIVER authored this Opinion, in which
JUDGES RYAN M. HARRIS and RYAN D. TENNEY concurred.

OLIVER, Judge:

¶1 Darcy F. Anderson challenges his convictions on two counts of sexual abuse of a child and one count of aggravated sexual abuse of a child, arguing (1) the trial court erred in failing to sua sponte hold a competency hearing, (2) his trial counsel (Counsel) provided ineffective assistance in several respects, and (3) the court plainly erred in admitting recorded interviews from the Children's Justice Center (CJC). We reject each of his arguments and affirm his convictions.

BACKGROUND[1]

¶2    Sixty-nine-year-old Anderson became "kind of like a grandfather" to ten-year-old Hailey[2] and her sisters when he moved in down the street, giving them gifts and money during their frequent visits to his house. During one visit, Anderson put his hand on the thigh of Hailey's stepsister (Sister) and asked her to kiss him, which she refused to do.

¶3    The next day, Hailey and three of her younger sisters, including Sister, went inside Anderson's house to watch a movie. Anderson sat next to Hailey on the couch. While the movie played, Anderson unbuttoned Hailey's pants and "put his fingers . . . in [her] vagina." Hailey made an excuse to go to the bathroom, but when she sat back down on the couch, Anderson put her hand on his penis. He again unbuttoned her pants and put his fingers in her vagina.

¶4    Anderson also asked Hailey to go into his bedroom. She told him no. Hailey made another excuse to go to the bathroom, and when she came out, Anderson was standing outside the door, pointing his cane toward a bedroom down the hall. Hailey followed him into the bedroom and got onto the bed with Anderson, where he pulled her pants down to her knees. But Hailey pulled her pants back up and fled the house. When she got home, Hailey—who was "upset" and "crying so hard [that] she was pale"—disclosed what had happened to her mother (Mother), who contacted law enforcement, and to her stepfather

---

1. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Cesspooch*, 2024 UT App 15, n.1, 544 P.3d 1046 (cleaned up).

2. We employ a pseudonym and a descriptive term for the minor children.

(Stepfather), who quickly retrieved Hailey's younger sisters from Anderson's house.

¶5      Two days later, Hailey and Sister were interviewed at the CJC. Sister recalled how the day before Hailey was abused, the girls had been at Anderson's house and he had rubbed her leg and asked her to kiss him. Sister also stated she had gone to Anderson's house on the day of the abuse but left before anything happened to Hailey.

¶6      Hailey disclosed that Anderson "kept pulling off [her] pants and touching [her] . . . vagina" on the couch. During a sexual assault examination the same day, Hailey gave the nurse (Nurse) a similar account, stating Anderson had "pulled down her pants and put his fingers inside" her. Nurse found Hailey's vagina was slightly red and irritated, which concerned her, as the exam occurred soon after the event. In an interview two days later, Stepfather told a police lieutenant (Lieutenant) he had wanted Hailey to "get checked immediately" to make sure she was not making false accusations because she was sometimes known to "do some storytelling."

¶7      Lieutenant interviewed Anderson several times. During the first interview—three days after the events at his house—he admitted to holding hands with Hailey but denied going into the bedroom with her. A few hours later, Anderson called Lieutenant, saying he had gone into the bedroom with Hailey and that they "laid down by each other holding hands" but he dozed off and could not remember anything else. During his third interview three days later, Anderson admitted to sitting on the couch and lying on the bed with Hailey, pulling her pants down, and touching her "on her tummy, a little lower." He stated he touched her "below the belly" "a time or two on the couch" and in the bedroom. And he admitted Hailey touched his penis. Anderson was later arrested and charged with two counts of sexual abuse of a child and one count of aggravated sexual abuse of a child.

¶8     Prior to trial, the State filed notice of its intent to introduce the recordings of Hailey's and Sister's CJC interviews under rule 15.5 of the Utah Rules of Criminal Procedure. At a pretrial conference, the trial court asked Counsel whether he intended to stipulate to the admission of these recordings, "provided they comply with the rule." Counsel said, "[W]e would do that, Your Honor." The court then stated it would allow the recordings to be "utilized consistent with Rule 15.5." At a later hearing, the court noted that "the parties have also examined together Rule 15.5 and all parties agree that all elements of Rule 15.5 have been met," and the court then made a "specific finding[]" that the recordings were admissible under rule 15.5(a)(8). Counsel lodged no objection.

¶9     At the final pretrial conference, Anderson complained to the court that his blood pressure was "out of whack," something was wrong with his neck, he was "on the verge of passing out quite often," he had a broken foot, and he had a self-diagnosed "aneurysm." He stated he had been in a car accident one month before his arrest and his injuries had not been treated in jail despite his requests for attention. Counsel then made a motion to continue the trial—which was scheduled to begin the next day—for "the purpose of looking into [Anderson's] health issues." When asked to clarify what these health issues were, Counsel informed the court that Anderson's son had mentioned there "may be some mental health issues" based on Anderson's behavior. But Counsel noted these were "offhand comments" and there had been "[n]othing concrete, nothing finite, nothing substantiated" as far as a formal mental health diagnosis. Counsel assured the court there was "nothing that led [him] to think that there would be . . . competency issues" or that Anderson could not "appreciate what was going on or couldn't understand or couldn't aid in his defense." Counsel did note that Anderson was confused about the trial date and could not remember receiving transcripts of the CJC interviews from Counsel, though Counsel knew he had read them. But the court was not concerned because Anderson had been "quickly corrected" about his trial date, he

had "numerous opportunities" to review the CJC transcripts, and Counsel confirmed that Anderson had actually done so. And ultimately, Counsel, a self-identified "bit of an expert when it comes to competency," told the court there was not "enough to do a competency petition."

¶10   The court recognized that no competency petition had been filed, there was "no formal diagnosis upon which [it] could act," and its own interactions with Anderson raised "no concern" that he was not "involved, understanding, and aware." And the court noted that prior to the final pretrial hearing, "there were no concerns expressed by [Anderson] or anyone involved with him of a nature that would cause the [c]ourt to need to derail the trial." Thus, the court denied Anderson's continuance motion.

¶11   The next morning, at the start of his trial, Anderson again complained to the court about his "medical condition" and about Counsel's performance with respect to case investigation and certain pre-trial motions, suggesting he might hire a new attorney. Counsel renewed his previous motion to continue "for the same reasons that [Anderson] has put on the record" and then explained the steps he had taken to prepare for trial. The court noted it had asked the State to "look into" Anderson's complaints about lack of medical treatment raised at the pretrial conference the day before. The State informed the court it had "conferred with jail staff" and had been "assured that medical personnel ha[d] been working with [Anderson] regularly" since he arrived and he had been checked "just prior to coming to court." The court stated Anderson had received adequate medical attention, had plenty of opportunity to hire an attorney, and had raised "nothing today or in the last few days that would necessitate a continuance" and thus denied Anderson's renewed motion.

¶12   During the State's case, Hailey, Sister, Mother, Nurse, and Lieutenant recounted the events above. Prior to Hailey's testimony, the State sought to play the recording of her CJC

interview. Before the recording was played, the court asked Counsel whether "there has been a stipulation relative to the applicability" of rule 15.5, to which Counsel replied, "Right." The interview was then played before Hailey's testimony. Sister's interview was also played before her testimony.

¶13 Lieutenant testified that he had a "feeling" that Hailey might have been coached in her CJC interview because she was "calling her vagina by the technical term." But he wrote in his report that Hailey was being "very honest," and he testified that after interviewing Anderson, he was no longer concerned about coaching as Anderson's version of events corroborated Hailey's "down to details." During Lieutenant's testimony, the State played portions of body camera footage showing his third interview with Anderson. The jury heard Anderson admit to touching Hailey "a time or two" on the couch and in the bedroom and having her touch his penis. Anderson testified on his own behalf, and portions of the interview were again played during Anderson's cross-examination, though he continued to deny the allegations against him. The jury found him guilty on all counts.

ISSUES AND STANDARDS OF REVIEW

¶14 Anderson argues the trial court erred in failing to sua sponte hold a hearing to evaluate his competency to stand trial. The parties dispute the standard of review. Anderson asserts that this court should evaluate the trial court's conduct for "clear error" and the State asserts that our review should be for plain error because the issue was unpreserved. We agree with the State.[3]

---

3. This court "generally will not consider an issue unless it has been preserved for appeal"—meaning it "has been presented to the [trial] court in such a way that the court has an opportunity to
(continued…)

¶15 On direct appeal, claims that the trial court failed to sua sponte evaluate a defendant's competency are reviewed for plain error. *See State v. Arguelles*, 2003 UT 1, ¶ 45, 63 P.3d 731; *see also State v. Poundstone*, 2011 UT App 341, ¶ 3, 263 P.3d 1204. "To demonstrate plain error, a defendant must establish that (i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome . . . ." *State v. Plazola*, 2023 UT App 161, ¶ 21, 542 P.3d 559 (cleaned up).

¶16 Anderson also raises several claims of ineffective assistance of counsel. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Naranjo*, 2023 UT App 131, ¶ 23, 538 P.3d 1278 (cleaned up).

¶17 Finally, Anderson argues the court erred in admitting the recordings of Hailey's and Sister's CJC interviews. Because Anderson did not raise this issue below, it is unpreserved, and he urges us to review it for plain error. But "under the doctrine of invited error, we have declined to engage in even plain error

---

rule on it." *State v. Johnson*, 2017 UT 76, ¶ 15, 416 P.3d 443 (cleaned up). Here, Anderson never filed a competency petition, so he asserts that he placed the issue before the trial court in his two motions to continue. But in making the first motion to continue "with the purpose of looking into [Anderson's] health issues," Counsel informed the trial court that there was "[n]othing concrete, nothing finite, nothing substantiated" and he had no basis to file a competency petition. And in making the second motion to continue, Counsel addressed only Anderson's complaints about Counsel's performance. Thus, the trial court was never asked to rule on Anderson's competency—leaving the issue unpreserved and thus reviewable for plain error.

review when counsel, either by statement or act, affirmatively represented to the trial court that he or she had no objection to the proceedings." *State v. Cruz*, 2016 UT App 234, ¶ 20, 387 P.3d 618 (cleaned up).

ANALYSIS

## I. The Trial Court's Failure to Sua Sponte Hold a Competency Hearing

¶18 Anderson contends the trial court erred by not holding a competency hearing sua sponte. A defendant establishes plain error by showing "(i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome." *State v. Plazola*, 2023 UT App 161, ¶ 21, 542 P.3d 559 (cleaned up). Because Anderson cannot show that the trial court erred in not sua sponte holding a competency hearing, this claim fails.[4]

¶19 "It is well established that due process requires that a defendant be mentally competent to stand trial." *State v. Parry*, 2018 UT App 20, ¶ 13, 414 P.3d 1044 (cleaned up). "To protect that due process right, Utah law mandates that no person who is incompetent to proceed shall be tried for a public offense." *State v. Wolf*, 2014 UT App 18, ¶ 18, 319 P.3d 757 (cleaned up); *see also* Utah Code § 77-15-1. A defendant is incompetent to proceed if he has a mental disorder which "renders him either (1) unable to have a rational and factual understanding of the proceedings against him or of the punishment specified for the offense charged

---

4. Even were we to review the trial court's actions under the "clear error" standard Anderson urges, we see no meaningful difference from our plain error analysis. Both standards require a determination that the trial court made an error, and we see no error on the record before us.

or (2) unable to consult with his counsel and to participate in the proceedings against him with a reasonable degree of rational understanding." *Wolf*, 2014 UT App 18, ¶ 19 (cleaned up); *see also* Utah Code § 77-15-2. The trial court may "raise the issue of the defendant's competency at any time." *State v. Arguelles*, 2003 UT 1, ¶ 49, 63 P.3d 731 (cleaned up). But in the absence of a competency petition filed by the defendant, defense counsel, the prosecution, or anyone acting as the defendant's custodian, the court is required to act sua sponte to hold a hearing to evaluate the defendant's competency "when there is a substantial question of possible doubt as to a defendant's competency" to proceed.[5] *Id.* (cleaned up).

¶20 Thus, whether the trial court erred by not holding a competency hearing turns on whether there was a substantial question as to Anderson's competency. In determining whether a substantial question existed, we "consider only those facts that were before the trial court" at the time. *Id.* ¶ 50 (cleaned up). Based on Anderson's interjections at the final pretrial hearing and on the first day of his trial, the court knew that he had been in a car accident one month before his arrest and he had numerous concerns about his "medical condition." But the court received assurances that Anderson had regularly received medical attention while in jail and had been "checked just prior to coming to court," with "no concerns to note."[6] And we fail to see how

---

5. The case law largely discusses defendants' competency to plead guilty. However, the "test for competency to plead guilty is the same as competency to stand trial," *York v. Shulsen*, 875 P.2d 590, 594 (Utah Ct. App. 1994), making these cases applicable here.

6. Anderson argues that the court asking the State to "look into" his medical concerns after the final pretrial hearing itself shows the court had substantial doubt about his competency. He also argues this inquiry was a violation of due process because the

(continued…)

these physical ailments—even in the aggregate—could have affected Anderson's competency to stand trial.

¶21    Aside from Anderson's medical concerns, the court also knew—based on Counsel's representation—that Anderson's son had mentioned potential "mental health issues." But Counsel was quick to inform the court that these were "offhand comments," not made by a medical professional, and there was "[n]othing concrete, nothing finite, nothing substantiated" as far as an official "diagnosis or anything like that." Such "an uncorroborated assertion of mental illness at trial [is] not sufficient to require a competency hearing." *State v. Young*, 780 P.2d 1233, 1236 (Utah 1989) (cleaned up). Moreover, even if Anderson did have a diagnosed mental disorder, "[a] defendant may be fit for trial even though his mind is otherwise unsound." *Jacobs v. State*, 2001 UT 17, ¶ 16, 20 P.3d 382 (quoting 21 Am. Jur. 2d *Criminal Law* § 97 (1998)); *see also State v. Biebinger*, 2018 UT App 123, ¶ 24, 428 P.3d 36 ("Mental illness is not equivalent to incompetency to stand trial." (cleaned up)).

¶22    Further, defense counsel is the person in the best position to evaluate a client's condition. *See Wolf*, 2014 UT App 18, ¶ 31. Here, Counsel identified himself as a "bit of an expert when it comes to competency" and assured the court that in all of his interactions with Anderson, there was "nothing that led [him] to think that there would be . . . competency issues" or that Anderson "didn't appreciate what was going on or couldn't

---

court made an ex parte request for the State to gather information and then used that information to evaluate his competency. But Anderson's medical condition did not have any bearing on his legal competency. As we discuss above, *see supra* note 3, Anderson's competency was not an issue before the court. Thus, the court's inquiry into Anderson's physical well-being did not manifest doubt as to his competency, nor did it violate due process.

understand or couldn't aid in his defense." Counsel did note that Anderson had been mistaken about his trial date and could not remember reading the transcripts of the CJC interviews Counsel had given him. But even a defendant's "amnesia" or inability to remember the "incident for which [the defendant] is charged" does not render him "per se incompetent." *York v. Shulsen*, 875 P.2d 590, 597 (Utah Ct. App. 1994). And here, the court found that Anderson's confusion about the trial date had been "quickly corrected" and that his lack of memory of the CJC transcripts was not concerning given his "numerous opportunities" to review them and Counsel's assurances that Anderson had done so.

¶23    The trial court observed that Anderson had "always been very appropriate in his behavior" in court and had given no indication that he had not "been involved, understanding, and aware." Thus, the court did not have a substantial reason to doubt Anderson's ability to have a "rational and factual understanding of the proceedings against him" or to "consult with his counsel" and meaningfully participate in the proceedings. *See Wolf*, 2014 UT App 18, ¶ 19 (cleaned up). Indeed, if a defendant who displays "irrational and disoriented" behavior and has a documented history of mental illness may be declared competent, *see State v. Bailey*, 712 P.2d 281, 282–85 (Utah 1985), there would have been no question—let alone a substantial one—that Anderson, who had not displayed any markedly irrational or disoriented behavior and had no documented history of mental illness, was competent too. Accordingly, we see no error in the trial court's failure to hold a competency hearing. Because no error occurred, this claim fails.

## II. Counsel's Ineffective Assistance

¶24    Anderson also levies several critiques at Counsel, arguing he provided ineffective assistance. To prevail on these claims, Anderson must show "(1) that Counsel's performance was deficient and (2) that the deficient performance prejudiced the

defense." *State v. Weaver*, 2023 UT App 154, ¶ 20, 541 P.3d 958 (cleaned up). To prove deficient performance, Anderson must show that Counsel's representation "fell below an objective standard of reasonableness." *Id.* (cleaned up). And to prove prejudice, Anderson must show "a reasonable probability that the case would have had a different outcome" absent Counsel's deficient performance. *Id.* ¶ 21 (cleaned up). "Because failure to establish either prong of the test is fatal to an ineffective assistance of counsel claim, we are free to address [his] claims under either prong," and "if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, we will do so." *State v. Samora*, 2023 UT 5, ¶ 21, 529 P.3d 330 (cleaned up).

A.     Failure to Call Stepfather as a Witness

¶25     Anderson urges that Stepfather's statement to Lieutenant that Hailey could "do some storytelling" would have undermined Hailey's credibility, so the failure to call Stepfather as a defense witness at trial amounts to ineffective assistance. We disagree.

¶26     First, we fail to see how Stepfather's testimony—even had it been favorable to Anderson—could have outweighed the evidence corroborating Hailey's testimony. Sister testified that the day before Hailey was sexually abused, Anderson had rubbed Sister's leg and asked her to kiss him. Mother testified about Hailey's distress immediately after returning home from Anderson's house on the day of the abuse. Nurse noted there had been "redness and irritation" of Hailey's vagina, which was "concerning" because the exam occurred so soon after the incident. The jury heard Anderson himself admit in the body camera footage of his interview with Lieutenant that he had touched Hailey "on her tummy, a little lower" and "below the belly" "a time or two" and that Hailey had touched his penis. Portions of this interview were played for the jury twice—once during Lieutenant's testimony and again during Anderson's cross-examination.

¶27 Second, Anderson argues Stepfather's testimony would have cast even more doubt on Hailey's credibility when coupled with Lieutenant's testimony that that there may have been "some coaching going on" in her CJC interview. But while Lieutenant did say he had an initial "feeling" that Hailey may have been coached because she was "calling her vagina by the technical term," he wrote in his report that he believed she was "being very honest," and after interviewing Anderson, he no longer believed she had been coached, as Anderson's "version of what happened on that day just corroborated" what Hailey had told him, "down to details." We are not persuaded that Lieutenant's testimony would have rendered Stepfather's testimony more impactful.

¶28 Thus, there is not a reasonable likelihood that Stepfather's general statement that Hailey could sometimes "do some storytelling" could outweigh the strong evidence—including Anderson's own admissions—indicating that Hailey was not, in fact, fabricating a story on this specific occasion about her abuse. This claim therefore fails for lack of prejudice.

B.    Stipulating to Admission of the CJC Interviews

¶29 Next, Anderson argues Counsel was ineffective for stipulating to the State's admission of Hailey's and Sister's recorded CJC interviews. Under rule 15.5(a) of the Utah Rules of Criminal Procedure, in any case involving a sexual offense against a minor, "the oral statement of a victim or other witness younger than 14 years of age which was recorded prior to the filing of an information or indictment is, upon motion and for good cause shown, admissible as evidence in any court proceeding regarding the offense," provided certain conditions are met.

¶30 Anderson asserts there are "obvious issues" with the reliability of the recorded interviews. He points to Lieutenant's testimony that he had "a feeling" that Hailey

may have been coached in her interview and Stepfather's statement that Hailey could "do some storytelling," arguing these statements rendered the recordings of the CJC interviews unreliable under rule 15.5(a)(8)—which requires the court to view the recording and determine "that it is sufficiently reliable and trustworthy"—and thus, that Counsel was ineffective for stipulating to their admission. But again, even had Counsel refrained from stipulating, we fail to see a reasonable likelihood of a different outcome for Anderson.

¶31 Absent the parties' stipulation, the court itself would have evaluated the admissibility of the recordings under rule 15.5. Despite Anderson's contentions, it is unlikely that Lieutenant's or Stepfather's statements would have led the court to conclude the recordings were unreliable or untrustworthy under rule 15.5(a)(8). While Lieutenant might have had an initial "feeling" that Hailey had been coached to use the technical term for vagina, he did not believe the events she recounted "had been fabricated or made up." And Stepfather's initial statement that Hailey could "do some storytelling" is undercut by his actions in quickly collecting Hailey's younger sisters from Anderson's house on the afternoon of the abuse. And the recordings met the other requirements of rule 15.5. Most importantly, the children were "available to testify and to be cross-examined at trial," *see* Utah R. Crim. P. 15.5(a)(1), "no attorney for either party [was] in the [girls'] presence" when their statements were recorded, *see id.* R. 15.5(a)(2), and the interviewers were both "present at the proceeding" and "available to testify and be cross-examined," *see id.* R. 15.5(a)(6). Thus, there is no indication that the court would have found the recordings inadmissible under rule 15.5.

¶32 Moreover, even if the recordings had been excluded, there was nothing in them that was not elicited through Hailey's or Sister's live testimony. Their trial testimony was remarkably consistent with their CJC interviews. The jury would have heard

them recount the events at Anderson's house either way. Thus, even without Counsel's stipulation, there is not a reasonable likelihood of a different outcome, and this claim also fails for lack of prejudice.

C.      Failure to File a Competency Petition

¶33    Finally, Anderson argues Counsel was ineffective for failing to file a competency petition. But we "have previously acknowledged that counsel does not perform deficiently by failing to file a competency petition if [counsel] had no basis to suspect the defendant was incompetent"—meaning the defendant lacked "a rational and factual understanding of the proceedings or of the punishment specified for the offense charged, or ha[d] the inability to consult with counsel and to participate in the proceedings with a reasonable degree of rational understanding." *State v. Bruhn*, 2019 UT App 21, ¶ 16, 438 P.3d 1031 (cleaned up).

¶34    Here, Counsel filed a motion to continue the trial "with the purpose of looking into some health issues," including Anderson's complaints about blood pressure, being "light of head" and stumbling, a broken foot, and a self-diagnosed "aneurysm." And Counsel informed the court that Anderson's son had mentioned that Anderson might have some mental health issues. But, as we discussed above, *see supra* Part I, Counsel stated he had seen "nothing that [led] him to think that" Anderson "didn't appreciate what was going on or couldn't understand or couldn't aid in his defense." Without sufficient reason to suspect Anderson was incompetent, Counsel did not perform deficiently in failing to file a competency petition.

¶35    Accordingly, for the reasons stated, we reject all of Anderson's claims that Counsel rendered constitutionally ineffective assistance.

### III. The Trial Court's Admission of the CJC Interviews

¶36 Anderson also argues that the trial court plainly erred in admitting Hailey's and Sister's recorded CJC interviews without making adequate findings under rule 15.5 of the Utah Rules of Criminal Procedure. But "under the doctrine of invited error, we have declined to engage in even plain error review when counsel, either by statement or act, affirmatively represented to the trial court that he or she had no objection to the proceedings." *State v. Cruz*, 2016 UT App 234, ¶ 20, 387 P.3d 618 (cleaned up).

¶37 Here, the trial court admitted the recordings because Counsel represented to the court that they met the requirements of rule 15.5. Counsel agreed to stipulate to the admission during a pretrial conference, "provided they comply with" rule 15.5. At a later hearing, the court noted that "the parties have also examined together Rule 15.5 and all parties agree that all elements of Rule 15.5 have been met." And just before the first recording was played for the jury, the court asked, "Counsel, to my understanding there has been a stipulation relative to the applicability [of] the rule . . . . Is that true[?]" Counsel replied, "Right." Anderson himself recognizes this as a stipulation for purposes of his ineffective assistance argument. *See supra* Part II.B. And such stipulation "represents a classic example of invited error." *State v. McNeil*, 2013 UT App 134, ¶ 19, 302 P.3d 844 (cleaned up). Thus, Anderson invited any error in the admission of the recorded CJC interviews, precluding plain error review, and his only option was to raise the issue through his ineffective assistance claim, which we have rejected. *See id.* ¶ 25 ("While invited error precludes a plain error claim, it does not preclude a claim for ineffective assistance of counsel.").

### CONCLUSION

¶38 The trial court did not plainly err in failing to hold a hearing to evaluate Anderson's competency, Anderson cannot

show that Counsel rendered ineffective assistance, and he invited any error in the court's admission of the CJC interviews. We therefore affirm his convictions.

––––––––––